# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TENNESSEE
## WESTERN DIVISION

| | |
|---|---|
| **IN RE: MORGAN KEEGAN CLOSED-END FUND LITIGATION** | **CLASS ACTION** |
| | |
| **CHARLES JONES and, IRA HOROWITZ Individually and On Behalf of All Others Similarly Situated,** | **COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS** |
| **Plaintiffs,** | **DEMAND FOR JURY TRIAL** |
| **vs.** | |
| **MORGAN KEEGAN & COMPANY, INC., MORGAN ASSET MANAGEMENT, INC., REGIONS FINANCIAL CORPORATION, RMK ADVANTAGE INCOME FUND, INC., RMK STRATEGIC INCOME FUND, INC., RMK HIGH INCOME FUND, INC., RHY MULTI-SECTOR HIGH INCOME FUND, INC., CARTER E. ANTHONY, ALLEN B. MORGAN, JR., JOSEPH WELLER, JAMES STILLMAN R. MCFADDEN, ARCHIE W. WILLIS, III, MARY S. STONE, W. RANDALL PITTMAN, J. KENNETH ALDERMAN, J. THOMPSON WELLER, JAMES C. KELSOE, JR., DAVID H. TANNEHILL, JACK R.BLAIR, ALBERT C. JOHNSON, CHARLES D. MAXWELL, and PRICEWATERHOUSE COOPERS, L.L.P.,** | |
| **Defendants.** | |

_____/

## CLASS ACTION COMPLAINT FOR VIOLATION
## OF THE FEDERAL SECUTIES LAWS

## <u>INTRODUCTION</u>

1.       Plaintiffs and putative class members Charles Jones ("Jones") and Ira Horowitz ("Horowitz") bring this putative class on their own behalf and on behalf of all persons who purchased the following closed-end mutual funds (collectively, "Funds"):

- RMK Advantage Income Fund ("RMA");
- RMK Strategic Income Fund ("RSF")
- RMK High Income Fund ("RMH"); and
- RHY Multi-Sector High Income Fund ("RHY").

2.       Plaintiffs do so for the class of purchasers who, pursuant to either the Funds' registration statements, filed with United States Securities & Exchange Commission ("S.E.C."), or pursuant to public statements by the Defendants, purchased one or more of the Funds between December 6, 2004 and February 6, 2008 ("Class Period").

3.       The Defendants' conduct, alleged in this putative class action, has spawned regulatory enforcement actions or investigations by at least five state regulators, the Financial Industry Regulatory Authority ("FINRA"), and the S.E.C., not to mention hundreds of FINRA arbitrations, where reams of documents are being produced to hundreds of claimants.  *See* Exhibit A (*In the Matter of Morgan Asset Mgmt., et al.*, Joint Notice of Intent To Revoke Registration and Impose Administrative Penalty); *see also*, Exhibit B (S.E.C.'s Order Administrative and Cease-And-Desist Proceedings) and Exhibit C (FINRA Enforcement Complaint) .  Exhibits A, B & C are hereby incorporated by reference into this Complaint.

4.      For example, on July 9, 2009, the S.E.C. served Defendant Regions Financial Corporation ("Regions"), Morgan Keegan & Co., Inc.'s ("Morgan Keegan") parent company, with a Wells Notice, which notified Regions that the S.E.C. would commence an enforcement action.

5.      On July 15, 2009, Regions made the following statement in S.E.C. Form 8-K:

> On July 9, 2009, Morgan Keegan & Company, Inc. ("Morgan Keegan") (a wholly-owned subsidiary of Regions Financial Corporation), Morgan Asset Management, Inc. and three employees, each received a "Wells" notice from the Staff of the Atlanta Regional Office of the United States Securities and Exchange Commission (the "Commission") stating that the Staff intends to recommend that the Commission bring enforcement actions for possible violations of the federal securities laws. The potential actions relate to the Staff's investigation of certain mutual funds formerly managed by Morgan Asset Management, Inc.

6.      This case arises from the Defendants' materially false and misleading statements and omissions regarding the Funds' value, content, and risks, both in registration statements and other filings with S.E.C. and in the public forum—much of the same conduct that triggered the Wells Notice and ensuing enforcement action by the S.E.C.

7.      These misstatements and omissions included the following:

a.      Omitting to disclose that an investment in the Funds entailed substantially more risk than their purported benchmark, the Lehman Brothers Ba U.S. High-Yield Index; this was so because the Funds were three times as volatile as their benchmark from April 2006 to September 2006, six times more volatile between October 2006 and March 2007, and twelve times as volatile from April 2007 to September 2007. This was so also because, unlike the Funds, the Funds' benchmark contained no structured finance products, whereas about 65% of the Funds' assets were structured finance products near the bottom of the deals' capital structure;

b.      Omitting to disclose the risk of implicit leverage in the credit structure of the Funds' asset pools;

3

c. Misstating that between ten and fifteen percent (10% - 15%) of the Funds' underlying assets were corporate bonds and preferred stocks when, in fact, those assets were below-investment-grade products;

d. Misrepresenting that the Funds offered safety through diversity across multiple fixed income asset classes when, in fact, the Funds were consistently invested in below investment grade securities;

e. Misrepresenting that the Funds provided a consistent level of income when, in fact, the Funds were loaded-up with structured products that were in the lowest tranches of asset-back securities;

f. Misrepresenting that the Funds offered a stable net asset value when, in fact, the Funds' true net asset value was extremely volatile;

g. Omitting material information about the substantial credit risk associated with investing in the lowest-tranched asset-backed securities; further, the registration statements and prospectuses omitted to disclose that cash flows from pools of such assets can also be tranched;

h. Misstating that the Funds' underlying assets were liquid when, in fact, the underlying assets were thinly traded and held by virtually no other fixed-income mutual funds other than the Funds themselves;

i. Misrepresenting the value of the Funds' underlying assets. Specifically, Morgan Keegan's accounting practices used valuation procedures that artificially inflated the values of the Funds' net asset value ("NAV"). For example, when Morgan Keegan finally hired an independent valuation consultant in March 2008, the consultant valued the Funds' underlying assets at less than one percent (1%) of the values assigned by Morgan Keegan;

j. Omitting to disclose that the Funds were investing the large majority of investor proceeds in sub-prime, illiquid, and untested investment structures (which ultimately caused each of the Funds to lose far more value in 2007 than any other mutual funds in the Funds' categories);

k. Omitting to disclose that the Funds' Boards of Directors were not discharging their legal responsibilities to determine the Funds' "fair valuation," in that the directors had abdicated their responsibility to do so to the Funds' investment advisor, which had undisclosed conflicts of interest because the advisors' compensation was based upon the Funds' "fair valuation;"

l.   Misstating that the Funds employed investment strategies different from one another when, in fact, the same manager managed all Funds, employed similar investment strategies, and the content of the Funds' portfolios overlapped significantly; and

m.   Omitting to disclose that the Funds were investing in assets backed by non-conforming mortgages that did not comply with Fannie Mae FHLMC standards.

## VENUE & JURISDICTION

8.      Venue lies in this District according to 28 U.S.C. § 1391(a) because a substantial part of the acts and omissions giving rise to Plaintiffs' claims occurred in this District.  Venue also lies in this District under 15 U.S.C. § 77v because the Defendants transact business in this District.

9.      This Court possesses subject-matter jurisdiction under 28 U.S.C. § 1331, 15 U.S.C. § 77v, and 15 U.S.C. § 78aa.

## PARTIES

10.     Plaintiff Charles Jones resides at 1129 Broad Street, Shrewsbury, New Jersey As explained in Jones' lead plaintiff certification, attached as Exhibit D, Jones purchased RMH, RMA, RSF, and RHY shares totaling approximately $2.1 million during the putative Class Period.  Jones still owns the shares he purchased, and the RHY shares Jones purchased are traceable to RHY's defective registration statement and amendments thereto.

11.     Plaintiff Ira Horowitz resides at 788 Coelar D'Alene Circle, El Paso, Texas. As explained in Horowitz's lead plaintiff certification, attached as Exhibit E, Horowitz purchased RMH, RMA, RSF, and RHY shares totaling over $300,000 during the putative Class Period.  Horowitz still owns some of the shares he purchased, and the RHY shares

Horowitz purchased are traceable to RHY's defective registration statement and amendments thereto

12.     Defendant Morgan Keegan & Company, Inc. ("Morgan Keegan"), a wholly-owned subsidiary of Defendant Regions Financial Corporation ("Regions"), is a Tennessee Corporation, with its principal place of business located in Memphis, Tennessee.  Morgan Keegan acted as an underwriter for Fund shares sold during the putative Class Period.

13.     Defendant Regions Financial Corporation ("Regions") is a Delaware Corporation, with its principal place of business in Birmingham, Alabama.  During the putative class period, Regions' subsidiaries offered and sold Fund shares.  Further, regulatory filings with FINRA state that Regions controls the management and policies of Defendant Morgan Keegan.

14.     Defendant Morgan Asset Management, Inc. ("MAM"), a Tennessee Corporation, is a registered investment advisor, which served as advisor to the Funds at all time relevant to this Complaint's allegations.  MAM is a wholly-owned subsidiary of Defendant MK Holding, Inc., and maintains its principal place of business in Memphis, Tennessee.

15.     Defendant RMK Advantage Income Fund, Inc. ("RMA") (n/k/a Helios Advantage Income Fund), a Maryland Corporation, is a closed-end management fund and maintains its principal place of business in New York City.  RMA is registered under the Investment Company Act of 1940 and issued a registration statement on September 7, 2004, and amendments on October 20, 2004 and November 5, 2004.

16.     Defendant RMK Strategic Income Fund, Inc., ("RSF") (n/k/a Helios Strategic Income Fund), a Maryland Corporation, is a closed-end management fund that maintains it principal place of business in New York City. RSF is registered under the Investment Company Act of 1940 and issued a registration statement on January 16, 2004 and amendments on February 26, 2004 and March 17, 2004.

17.     Defendant RMK High Income Fund, Inc., ("RMH") (n/k/a Helios High Income Fund), a Maryland Corporation, is a closed-end management fund that maintains its principal place of business in New York City.  RMH is registered under the Investment Company Act of 1940 and issued a registration statement on June 23, 2003 and amendments on April 16, 2003 and May 28, 2003.

18.     Defendant RHY Multi-Sector High Income Fund ("RHY") (n/k/a Helios Multi-Sector High Income Fund), a Maryland Corporation, is a closed-end management fund that maintains is principal place of business in New York City.  RHY is registered under the Investment Company Act of 1940 and issued a registration statement on January 9, 2006 and amendments on January 18, 2006 and November 14, 2006.

19.     The following defendants signed RHY's registration statement and amendments:

        (a)     Carter E. Anthony ("Anthony");
        (b)     Joseph C. Weller ("Weller");
        (c)     J. Kenneth Alderman ("Alderman");
        (d)     Jack R. Blair ("Blair");
        (e)     Albert C. Johnson ("Johnson");
        (f)     James Stillman R. McFadden ("McFadden");
        (g)     W. Randall Pittman ("Pittman");
        (h)     Mary S. Stone ("Stone");
        (i)     Allen B. Morgan, Jr. ("Morgan");
        (j)     Archie W. Willis ("Willis"); and
        (k)     Pricewaterhouse Coopers, L.L.P. ("PwC").

20.     Defendant Carter E. Anthony was President and Chief Investment Officer of Morgan Asset.  Anthony was also the President of RHY and RMA.

21.     Defendant Joseph E. Weller co-founded Morgan Keegan.  At all relevant times, Weller was Morgan Keegan's Vice-Chairman, and the Treasurer for all four Funds.

22.     Defendant J. Kenneth Alderman served as a director of RHY and CEO of Morgan Keegan Asset.

23.     Defendant Jack R. Blair served as a director of RHY.

24.     Defendant Albert C. Johnson served as a director of RHY.

25.     Defendant James Stillman R. McFadden served as a director of RHY.

26.     Defendant W. Randall Pittman served as a director of RHY.

27.     Defendant Mary S. Stone served as a director of RHY.

28.     Defendant Allen B. Morgan, Jr., founded Morgan Keegan in 1969 and, at all relevant times, served as Morgan Keegan's Chairman and Vice-Chairman of Regions. Additionally, Morgan served as a director of RHY.

29.     Defendant Archie W. Willis, III, served as a director of RHY.

30.     Defendant PricewaterhouseCoopers is a professional firm of Certified Public Accountants ("CPA's") that provides, among other services, tax and audit services to publicly-traded entities like the Funds here, which engaged PwC to provide independent accounting and auditing services.  PwC's far-reaching services for the Funds here and PwC's close relationship with the Funds and the Funds' management provided PwC with intimate familiarity with the Funds' accounting for valuation of Fund assets.

31.     Defendant Charles D. Maxwell served as President of RSF and RMH.

32.     Defendant James C. Kelsoe, Jr., served as the Funds' and Morgan Asset's Senior Portfolio Manager.

## FACTUAL ALLEGATIONS

33.     The Funds lost $1 billion in market value during 2007 because, among other reasons, the Funds held concentrated holdings of low-priority tranches in structured finance deals, which were backed by risky assets—a risk not adequately disclosed to investors.

34.     No defendant here disclosed in S.E.C. filings the risks facing investors vis-à-vis the Funds investing the majority of their portfolios in subordinated tranches of asset-backed securities.  In fact, neither the Funds nor Defendant Kelsoe disclosed these risks until after the losses had occurred.

35.     The Defendants also misrepresented hundreds of millions of dollars of asset-backed securities as corporate bonds and preferred stocks.  The Funds did so in their S.E.C. filings, thus making the funds seem more diversified and less risky than the Funds actually were.

36.     The Funds were marketed as four different funds that employed different investment strategies.  However, the Funds were managed almost identically by the same manager, Defendant Kelsoe, who has testified in arbitration hearings that the Funds' portfolios contained many of the same securities, *i.e.*, the Funds' portfolios were highly correlated.  Consequently, investors who purchased more than one of the Funds were misled to believe that by doing so, they were diversifying their risk and reducing their overall exposure to market risk.

37.     The Defendants further misled investors via the Funds' S.E.C. filings and marketing materials by comparing the Funds to the Lehman Ba Index.  This comparison was materially misleading because the Lehman index contained no asset-backed securities, unlike the Funds, which contained substantial amounts of asset-backed securities.  This is so because the Lehman index contained only corporate bonds and no structured finance products, whereas the Funds held three times as much structured finance securities as they held corporate bonds.  *See* Exhibit F at 8-9 (McCann, Craig, PhD, *Regions Morgan Keegan:  The Abuse of Structured Finance*).

38.     Specifically, in a March 31, 2007 filing with the S.E.C., Morgan Keegan misrepresented over $215 million in highly leveraged, illiquid asset-backed securities as corporate bonds and preferred stocks as follows:

> (a)     $44.1 million in asset-backed securities held by RMH;
> (b)     $44.1 million in asset-backed securities held by RSF;
> (c)     $59.3 million in asset-backed securities held by RMA; and
> (d)     $67.5 million in asset-backed securities held by RHY.

*See* Exhibit F at 10-11 (tables showing Defendants' reported valuations of asset-backed securities and the corrected amounts).

39.     Further, in RMH's February 28, 2007 Form N-Q, filed with the S.E.C., Defendant RMH misrepresented Webster CDO I Preferred Shares as preferred shares when, in fact, these securities were asset-backed securities-below investment grade or unrated collateralized debt obligations.

40.     RMH reported the value of this asset at $1.8 million as of March 31, 2007, or at $0.90 a share.  The valuation of these securities was inflated because claims of investors in these securities were subordinated to the claims of investors in the rest of the

deal.  By March 31, 2008, RMH reported the total value of these securities at just twenty dollars ($20).  *See* Exhibit F at 18-19.

41.    Defendants RSF and RMA made similar misrepresentations in their February 28, 2007 Form N-Q's, and as with RMH's Form N-Q, Defendant Weller signed and certified the accuracy of said forms.

42.    Defendant RHY also misrepresented Webster CDO I Preferred Shares as Preferred shares when, in fact, these securities were asset-backed securities, below investment grade or unrated, collateralized debt obligations.  RHY did not correct this misrepresentation until March 31, 2008.  Defendant Weller signed and certified the accuracy of this Form N-Q.

43.    This misrepresentation misled investors about the riskiness of RHY's holdings in asset-backed securities.  This is because, in truth, Webster CDO I Preferred Shares was ranked 15th out of 15 in terms of interest waterfall and not eligible to receive any interest payments if default occurred.  Further, no principal payments would be made on these securities until maturity date.  These shares were effectively an investment in the underlying sub-prime assets, leveraged at about 23 to 1.

44.    RHY reported the value of this asset at $3.15 million as of March 31, 2007 or at $0.90 a share.  The valuation of these securities was inflated because claims of investors in these securities were subordinated to the claims of investors in the rest of the deal.  By March 31, 2008, RHY reported the total value of these securities at just thirty-five dollars ($35).  *See* Exhibit F at 18-19.

45.     Similarly in their February 28, 2007 Forms N-Q, the Funds misrepresented their holdings in Eirles Two Ltd. 263 as corporate bonds.  That was inaccurate because, in truth, Eirles Two Ltd. 263 was an asset-backed security—another way in which the Defendants misled investors about the composition and risks of the Funds.  Not until March 31, 2008, did Defendants make the corrective disclosure that Eirles Two Ltd. 263 was, in fact, an asset-backed security.  *See* Exhibit F at 19-20.

46.     RHY's prospectus, which is part of RHY's registration statement, failed to disclose the highly concentrated credit risk that RHY was foisting on RHY investors through RHY's purchase of low-priority tranches in a wide range of structured finance deals.  Nor did RHY's prospectus mention that cash flows from pools of assets, including mortgages, can be tranched.  These omissions were materially misleading because the Funds' primary stated investment objective was to achieve cash flow for investors.

47.     Further, the Funds' registration statements discuss leveraged risk and, when doing so, indicate a limit of 1.33 to 1.  But the Funds' use of so many low-priority tranches increased leverage to 10 to 1.  *See* Exhibit F at 26.  This increased leverage also increased the Funds' credit risk and explains the Funds' spectacular collapse in 2007.

48.     The Funds' registration statements also misstated that the Funds would not invest more than twenty-five percent (25%) of total Fund assets in securities of companies in the same industry.  In fact, however, the Funds invested more than twenty-five percent (25%) of Fund assets in securities linked to the mortgage industry—a fact that the Funds and PwC concealed from investors.  Consequently, the Funds were not as diversified as represented.

49.     Specifically, each of the Funds invested more than 50 percent of their assets in the mortgage industry, which Bloomberg reported on June 30, 2007.

50.     The Funds and PwC recklessly disregarded the ABX.HE Index.  The ABX.HE Index is a default swap index based on subprime mortgages.  It is widely recognized as a reliable pricing mechanism for mortgage-backed securities.  This index suffered a serious downturn at the in 2007.  That downturn alerted the Funds, Morgan Asset Management, Kelsoe, and PwC that the Funds needed to record an impairment to the Funds' asset portfolios, according to applicable accounting rules.  These Defendants, however, were motivated to delay recording the impairment, and thus, to keep the Funds' net asset values at inflated levels.  These Defendants were so motivated because the higher the net asset value, the more fees the Funds paid to Morgan Asset Management and Kelsoe.

51.     This failure to write-down asset valuations or to record impairment to asset value violated Financial Accounting Standards 115 ("FAS 115"). FAS 115 requires that an asset value write-down if "it is probable that the investor will be unable to collect all amounts due according to the contractual terms of a debt security not impaired at acquisition."  If this impairment is "other than temporary," the cost basis of the security must be written down to fair value and the enterprise must include the write-down as a realized loss in its earnings report.

52.     Not later than January 2007, the Funds should have written-down the value of their mortgage-backed securities because, by that time, the ABX index had declined significantly, signaling more than a temporary impairment of the Funds' investments in those securities.

53.     Additionally, on January 19, 2006, Morgan Keegan filed a Statement of Additional Information ("SAI") for RHY.  While referring to tranching, the SAI omitted to disclose that RHY would be concentrated in the lowest priority, highly-leveraged tranches in deals backed up by assets with significant credit risk—credit risk not fully disclosed to investors, and credit risk responsible for the Funds' losing $1 billion in market value in 2007.

54.     On September 30, 2006, RHY and the other Funds filed with the S.E.C. a semi-annual report.  The reports misleadingly described the Funds' risks as follows:

> INVESTMENT RISKS:     Bond funds tend to experience smaller fluctuations in value than stock funds.  However, investors in any bond fund should anticipate fluctuations in price.  Bond prices and the value of bond funds decline as interest rates rise.  Longer-term funds generally are more vulnerable to interest rate irks than shorter-term funds.  Below investment grade bonds involve  greater credit risk, which is the risk that the issuer will not make interest or principal payment when due.  An economic downturn or period of rising interest rates could adversely affect the ability of issuers, especially issuers of below investment grade debt, to service primary obligations and an unanticipated default could cause the Fund to experience a reduction in value of its shares.  The value of U.S. and foreign equity securities in which the Fund invests will change based on changes in a company's financial condition and in overall market and economic conditions.   Leverage creates an opportunity for an increased return to common stockholders, but unless the income and capital appreciation, if any, on securities acquired with leverage proceeds exceed the costs of the leverage, the use of leverage will diminish the investment performance of the Fund's shares.  Use of leverage may also increase the likelihood that the net asset value of the Fund and market value of its common shares will be more volatile, and the yield and total return to common stockholders will tend to fluctuate more in response to changes interest rates and creditworthiness.

Each Fund in its September 2006 semi-annual report provided a similar, if not identical, description of purported "INVESTMENT RISKS."  These descriptions, however, were materially misleading when given because nowhere in these descriptions did the Funds

disclose the leveraged credit risk investors faced as a result of the Funds' concentration in low-priority tranches in structured securities.

55.     In these same September 2006 semi-annual reports, the Funds also misled investors about the reasons for the Funds' strong returns in 2006.  Although the real reason for the Funds' returns was the undisclosed credit leverage risk explained above, the Funds falsely attributed the returns to "the stability of the Funds' net asset value offered by a very diverse portfolio."  In truth, however, the Funds were guessing about net asset value—completely forsaking assurances made in the Funds' registration statements that the Funds' boards used "fair valuation" procedures to determine net asset value.  Further, the Funds' portfolios were anything but "diverse."  The Funds' portfolios, in truth, were concentrated in low-priority tranches that were highly leveraged.

56.     Then, in September 2007, RHY and the other Funds alluded to the fact that their investment in subordinated securities might increase credit risks.  They did so with the following statement, which itself was materially misleading:

> The Fund's investments in mortgage-backed asset-backed securities that are "subordinated" to other interests in the same [asset] pool may increase credit risk to the extent that the Fund as a holder of those securities may only receive payments after the pool's obligations to other investors have been satisfied.

57.     But even this purported disclosure was materially misleading because it was not that the Funds' investments in "subordinated" securities might (or "may") increase credit risk.  That fact was then that the Funds' overconcentration in such securities already had exposed investors to increased credit risk.

58.     On March 6, 2008, one of Morgan Keegan's open-end funds, RMK Select Fund, Inc., made the following disclosure:

>The structured finance category has taken the hardest hit so
>far due to the implicit (*i.e.*, built into the structures) and
>explicit (*i.e.*, financed, or bought on margin) leverage
>employed for this asset category.

59.    Unfortunately for Morgan Keegan's closed-end fund investors—the putative

class here—Morgan Keegan made no such disclosure for the Funds here.  Nevertheless,

this disclosure of the open-end fund is relevant here because:

>(a)    for the first time, Morgan Keegan acknowledged that
>structured products are leveraged;
>
>(b)    for the first time, Moran Keegan identified structured finance
>as an asset category;
>
>(c)    while making this disclosure for an open-end fund, Morgan
>Keegan made no such disclosure for the closed-end Funds
>here, even though the closed-end Funds here were heavily
>laden with structured products—a material omission vis-à-vis
>the closed-end Funds here; and
>
>(d)    As Defendant Kelsoe has testified in numerous arbitration
>hearings, the closed-end Funds here and the open-end funds
>not at issue here contained hundreds of the same securities,
>and thus, were not all that different from one another vis-à-
>vis the content of their portfolios.

60.    The Funds indeed disclosed their ability to invest in securities with credit

ratings of BB or lower.  But even that was not full disclosure of the credit risk faced by

Fund investors.  Rather, it was materially misleading because the Funds omitted to

disclose credit risk ratings did not account for probability of default, expected losses,

illiquidity, and market risks.

61.    The Funds also misled investors about the liquidity of the private placements

held in the Funds when, in the Funds' 2007 annual reports, the Funds said that

"[p]ursuant to valuation policies and procedures adopted by the Board . . ., these issues

have been determined to be liquid by Morgan Asset Management, Inc., the Fund's

investment advisor." In truth, however, these private placements were illiquid, which made it almost impossible for the Funds to sell these private placements, let alone at the artificially inflated valued arbitrarily assigned by Morgan Keegan Asset Management.

62. This is clear because, starting in 2008, after the Funds lost over fifty percent (50%) of their value, the misstatement that the Funds' private placements were "liquid" no longer appeared in the Funds' S.E.C. filings.

63. In August 2007, Morgan Keegan and the Funds hired an independent valuation consultant to value the Funds' assets, including the illiquid private placements. Applying fair valuation procedures, which neither Morgan Asset Management nor the Funds had applied, the valuation consultant decreased the value of at least 21 private placements held by the Funds by as much as 99.9% of the originally stated (and artificially inflated) values Morgan Asset Management and the Funds assigned to these 21 private placements, as set forth the following chart:

| Issue | When Acquired | Cost | March 2008 |
|-------|--------------|------|-----------|
| 1,000,387 Knollwood CDO Ltd. 2006-2A E | Acquired 8/24/06, | Cost $1,000,387 | $100 |
| 2,000 WEBS CDO 2006-1 PS | Acquired 12/7/06, | Cost $1,800,000 | $20 |
| 1,000,000 Kodiak CDO 2007-2A E, | Acquired 6/29/07, | Cost $983,734 | $45,000 |
| 4,123,306 Taberna Preferred Funding Ltd. 2006-6A | Acquired 6/27/06, | Cost $4,102,201 | $41,233 |
| 2,838,133 Taberna Preferred Funding Ltd. 2006-7A C1 | Acquired 9/28/06, | Cost $2,795,628 | $56,763 |
| 4,000,000 Aladdin CDO I Ltd. 2006-3A | Acquired 8/7/06–7/2/07, | Cost $2,291,306 | $410,000 |
| 2,000,000 Attentus CDO Ltd. 2006-2A F1 | Acquired 10/12/06, | Cost $1,952,100 | $15,000 |
| 3,000,000 Attentus CDO Ltd. 2007-3A F2 | Acquired 1/18/07, | Cost $2,884,128 | $7,500 |
| 1,000,000 Gulf Stream Atlantic CDO Ltd. 2007-1A | Acquired 2/28/07, | Cost $844,318 | $100 |
| 2,897,636 IMAC CDO Ltd. 2007-2A E | Acquired 5/4/07, | Cost $2,772,069 | $290 |
| 1,000,000 IXIS ABS 1 Ltd., 12/12/46 | Acquired 11/15/06, | Cost $787,560 | $20,000 |
| 4,000,000 Kodiak CDO 2006-1A, 8/7/37 | Acquired 9/29/06, | Cost $3,619,520 | $10,000 |
| 3,133,608 Kodiak CDO 2006-1A G | Acquired 11/13/06, | Cost $3,061,970 | $7,834 |
| 2,889,504 Lexington Capital Funding Ltd. 2007-3A F | Acquired 2/9/07, | Cost $2,805,283 | $101,133 |
| 1,039,100 Newbury Street CDO Ltd. 2007-1A D | Acquired 3/8/07, | Cost $1,024,549 | $104 |
| 1,961,789 Norma CDO Ltd. 2007-1A E | Acquired 3/1/07, | Cost $1,942,679 | $19,618 |
| 2,885,255 Sharps CDO 2006-1A D | Acquired 12/5/07, | Cost $2,738,340 | $21,639 |
| 2,000,000 Trapeza CDO I LLC 2006-10A D2 | Acquired 6/15/06, | Cost $2,000,000 | $190,000 |
| 2,000,000 Terwin Mortgage Trust 2006-R3 | Acquired 6/30/06, | Cost $1,655,458 | $200 |
| 5,000,000 Harborview Corp. 2006-14 PS | Acquired 3/6/07, | Cost $1,076,734 | $66,050 |
| 2,959,259 Harborview Mortgage Loan Trust 2006 | Acquired 5/23/06, | Cost $1,871,617 | $231,118 |

64.     As the above chart makes clear, the tremendous loss in the value of the Funds'
assets stemmed from Funds' and Morgan Asset Management's attaching baseless and
inflated values to these illiquid private placements.

65.     The valuations assigned these private placements and the Funds other assets
were not assigned in accord with applicable S.E.C. rulings, which require that "fair
value" be based upon what the Funds could reasonably expect to obtain for the securities
upon those securities' "current sale."  Here, no such analysis was conducted.  Prior to the
Funds' hiring an independent valuation consultant, the valuations assigned were the
product of mere guesswork by Defendants Kelsoe and Morgan Asset Management.

66.     In fact, in or around mid-2007, Defendant Kelsoe and non-party Gary Stringer
pressured Morgan Asset Management to reduce or eliminate any potential write-down in
the Funds' net asset value.

67.     Further, before the third fiscal quarter of 2007, the Funds' reported valuations
of their assets improperly assumed that the Funds' highly illiquid assets could be
liquidated on a current basis at the prices paid by the funds.  Likewise, the Funds and
PwC failed to reasonably discount asset valuations based upon illiquidity.  These actions
were deliberately reckless, violated S.E.C. directives, and were concealed from investors.

68.     At an annual shareholder meeting in July 2007, Kelsoe stated that declining
conditions in the credit and subprime mortgage market had adversely affected the Funds'
performance and, consequently, the Funds' dividends would be reduced by $0.01 per
share to $0.14 per share.  Kelsoe falsely assured investors that "defaults have not be a
problem thus far, cash flows continue[d] to look promising, and earnings [would]

continue to in at or above our expectations to date."   The price of the Funds fell in response to this news.

69.     On August 10, 2007, less than a month after Kelsoe's announcement at the shareholders' meeting, Kelsoe wrote to the Funds' shareholders, acknowledging problems in valuing the Funds' assets.   Among other things, Kelsoe falsely stated that, "In the past few weeks, there has been more volatility and downward pressure on the [net asset values] as a result of the difficulty in valuing these securities."   On this news, the price of the Funds' shares fell further.

70.     Kelsoe's August 10th 2007 statement was materially false and misleading because it implied that before late summer 2007, the Funds' net asset values were not inflated, which they were.   So, even Kelsoe's purported disclosure was misleading because the problem in determining net asset value was not volatility, it was illiquidity.

71.     By November 2007, in the wake of multiple disclosures about declining net asset value, the Funds were trading at less than one-third of their initial offering price.

72.     PwC examined and opined on the Funds' financial statements filed with S.E.C., which falsely overstated the Funds' asset valuations.   PwC issued unqualified opinions as to the Funds' financial statements and internal controls and consented to these opinions being incorporated into the Funds' registration statements. PwC knew or was deliberately reckless in providing such unqualified opinions because, as previously alleged, the Funds' asset valuations violated FAS 115.   Further, PwC possessed no reasonable basis to certify the Funds' financial statements, including asset valuations because of the assets' illiquidity and impairment.   PwC's doing so amounted to deliberate recklessness.

73.     The Defendants acted to intentionally mislead investors, or acted with deliberate recklessness to mislead investors, about the Funds' net asset value because Defendants knew that the Funds' composition bore no resemblance to the Lehman index, the index that Defendants cited as one to guide net asset valuation.   Further, the Defendants ignored the ABX index, which more accurately reflected a guide to net asset value because the ABX index focused on mortgage-backed assets, which is what made up a large portion of the Funds' portfolios.

74.     The Defendants acted to intentionally mislead investors, or acted with deliberate recklessness to mislead investors, about the degree of risk associated with investing in the Funds because the Defendants knew, but did not disclose, the true degree of leverage and accompanying credit risk that came with the extreme leverage in Fund assets.

75.     The Defendants acted to intentionally mislead investors, or acted with deliberate recklessness to mislead investors, about the degree of risk associated with investing in the Funds because the Defendants knew, but did not disclose, that the Funds were investing mostly in the lowest tranches of structured finance deals.

76.     The Defendants acted to intentionally mislead investors, or acted with deliberate recklessness to mislead investors, about the degree of risk associated with investing in the Funds because the Defendants knew, but did not disclose, that net asset values were arbitrarily set by Kelsoe and Morgan Asset Management and that those arbitrarily assigned values bore no relation to the assets' true value, given those assets' illiquidity.

77.    The Defendants acted to intentionally mislead investors, or acted with deliberate recklessness to mislead investors, about the degree of risk associated with investing in the Funds because the Defendants knew, but did not disclose, that contrary to what the Funds' S.E.C. filings said, the Funds' Boards of Directors did not employ fair valuation procedures.   The Defendants did not disclose that net asset values were arbitrarily set by Kelsoe, Morgan Keegan, and Morgan Asset Management.

78.    The Defendants acted to intentionally mislead investors, or acted with deliberate recklessness to mislead investors, about the degree of risk associated with investing in the Funds because the Defendants knew, but did not disclose, the true degree of leverage and accompanying credit risk that came with the extreme leverage in Fund assets.

79.    The Defendants acted to intentionally mislead investors, or acted with deliberate recklessness to mislead investors, about the degree of risk associated with investing in the Funds because the Defendants mischaracterized the nature of the Funds' assets, as alleged in paragraphs 39 through 46.

80.    Investor losses here were not caused by market meltdowns in mortgage markets or the financial markets in general.   Rather, investor losses here were caused by the Defendants' misstatements and omissions about the Funds' assets, credit risk, content, leverage, and net asset values.   To see that this is so, the Court need look no further than the dramatically higher volatility the Funds displayed as compared to the Lehman index that Defendants cited as the appropriate benchmark comparison for the Funds.

81.     Once the truth was revealed about the Funds' true content, *i.e*., loaded-up with low-tranched structured finance deals, illiquid private placements, and over-loaded with mortgage industry-related assets, the Funds' values collapsed and investors lost about $1 billion.

## CLASS ACTION ALLEGATIONS

82.     Plaintiffs bring this putative class action under Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired shares in the Funds between December 6, 2004 and February 6, 2008, and who lost money because of the Defendants' materially misleading misstatements and omissions as alleged in this Complaint (the "Class").

83.     Excluded from the putative Class are the Defendants, officers and directors of Regions, Morgan Keegan, and Morgan Asset Management and, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.  Also excluded are those putative Class members who have already filed (or who file) FINRA arbitrations before the opt-out period expires.

84.     The members of the putative Class are so numbers that joinder of all putative Class members would not be practical.

85.     As of September 30, 2007, the number of outstanding shares in the Funds was approximately 100 million shares.  While the exact number of putative Class members is now unknown to Plaintiffs and can only be ascertained through discovery, Plaintiffs believe that the total number of putative Class members numbers tens or hundreds of thousands.

86.     Plaintiffs' claims are typical of the putative Class's claims because both Plaintiffs and all other putative Class members have been similarly harmed by Defendants' wrongful conduct, identified in this Complaint.

87.     Plaintiffs will fairly and adequately protect the interests of the members of the

88.     Class and have hired counsel competent and experienced in securities class action litigation.   Common questions of law and fact exist as to all putative Class members and predominate over any questions affecting individual members of the putative Class.  Among the questions of fact and law common to the putative Class are:

a.   Whether Defendants omitted to disclose that the Funds entailed substantially more risk than their purported benchmark, the Lehman Brothers Ba U.S. High-Yield Index; this was so because the Funds were three times as volatile as their benchmark from April 2006 to September 2006, six times more volatile between October 2006 and March 2007, and twelve times as volatile from April 2007 to September 2007.  Whether this was so also because, unlike the Funds, the Funds' benchmark contained no structured finance products, whereas about 65% of the Funds' assets were structured finance products near the bottom of the deals' capital structure;

b.   Whether the Defendants omitted to disclose the risk of implicit leverage in the credit structure of the Funds' asset pools;

c.   Whether the Defendants misstated that between ten and fifteen percent (10% - 15%) of the Funds' underlying assets were corporate bonds and preferred stocks when, in fact, those assets were below-investment-grade product;

d.   Whether the Defendants misrepresenting that the Funds offered safety through diversity across multiple fixed income asset classes when, in fact, the Funds were consistently invested in below investment grade securities;

e.   Whether the Defendants misrepresented that the Funds provided a consistent level of income when, in fact, the Funds were loaded-up with structured products that were in the lowest tranches of asset-back securities;

f.   Whether the Defendants misrepresented that the Funds offered a stable net asset value when, in fact, the Funds true net asset value was extremely volatile;

g.   Whether the Defendants omitted material information about the substantial credit risk associated with investing in the lowest-tranched asset-backed securities; further, whether the Funds' registration statements and prospectuses omitted to disclose that cash flows from pools of such assets can also be tranched;

h.   Whether the Defendants misstated that the Funds' underlying assets were liquid when, in fact, the underlying assets were thinly traded and held by virtually no other fixed-income mutual funds other than the Funds themselves;

i.   Whether the Defendants misrepresented the value of the Funds' underlying assets. Specifically, whether Defendants Morgan Keegan, Morgan Asset Management, and Kelsoe used valuation procedures that artificially inflated. For example, when Morgan Keegan finally hired an independent valuation consultant in March 2008, the consultant valued the Funds' underlying assets at less than one percent (1%) of the values assigned by Morgan Keegan, Morgan Asset Management, and Kelsoe;

j.   Whether the Defendants omitted to disclose that the Funds were investing the large majority of investor proceeds in sub-prime, illiquid, and untested investment structures (which ultimately caused each of the Funds to lose far more value in 2007 than any other mutual funds in the Funds' categories);

k.   Whether the Defendants omitted to disclose that the Funds' Boards of Directors were not discharging their legal responsibilities to determine the Funds' "fair valuation," in that the directors had abdicated their responsibility to do so to the Funds' investment advisor, which had undisclosed conflicts of interest because the advisors' compensation was based upon the Funds' "fair valuation;"

l.   Whether the Defendants misstated that the Funds employed investment strategies different from one another when, in fact, the same manager managed all Funds, employed similar investment strategies, and the content of the Funds' portfolios overlapped significantly;

m.   Whether the Defendants omitted to disclose that the Funds were investing in assets backed by non-conforming mortgages that did not comply with Fannie Mae FHLMC standards;

n.   Whether RHY's registration statement violated Section 11(a) of The Securities Act of 1933;

o.  Whether the RHY and the individuals who signed RHY's registration statement violated Section 11 (a) of The Securities Act of 1933;

p.  Whether Defendant PwC violated Section 11(a) of The Securities Act of 1933 when PwC certified RHY's financial statements in RHY's registration statement;

q.  Whether Defendant Regions acted as a control person under Section 15 of The Securities Act of 1933 vis-à-vis RHY's registration statement;

r.  Whether the Defendants' misstatement and omissions identified in this Complaint violated Section 10(b) and Rule 10b-5 of The Securities Exchange Act of 1934;

s.  Whether the Defendants acted with the requisite scienter for Section 10(b) violations, as alleged in paragraphs 74 through 80 of this Complaint;

t.  Whether, for purposes of Section 10(b) and Rule 10b-5, the misstatements and omission identified in this Complaint caused the putative Class financial loss;

u.  Whether the misstatements and omissions identified in this Complaint were material for purposes of liability under Section 11(a) of The Securities Act of 1933 and Section 10(b) and Rule 10b-5 of The Securities Exchange Act of 1934;

v.  Whether Defendant Regions acted as a control person under Section 20(a) of the Securities Exchange Act of 1934; and

w.  Whether the individual defendants acted as control persons under Section 20(a).

89.  Plaintiffs' claims typify those of the putative Class because Plaintiffs and the putative Class suffered financial loss, caused by the Defendants' violations of Sections 11(a) and 15 of The Securities Act of 1933 and Section 10(b), Rule 10b-5, and Section 20(a) of the Securities Act of 1934.

90.  Plaintiffs have no conflicts with the putative Class and will protect the putative Class's interests.

91.     A class action stands superior to all other available methods for the fair and efficient adjudication of this matter since joinder of all putative Class members is not practical.  Furthermore, since damages suffered by individual class members may be relatively small, the expense and burden of thousands of individual cases might make it difficult or impossible for members of the putative Class individually to seek redress for the wrongs done to them. There will be no difficulty in managing this putative class action.

**COUNT ONE—VIOLATION OF § 11(a) of THE SECURITIES ACT OF 1933**

**Against Defendants RHY, PwC, Anthony, Weller, Alderman, Blair, Johnson, McFadden, McFadden, Pittman, Stone, Morgan, Willis.**

92.     Plaintiffs incorporate here by reference the allegations contained in paragraphs 1 through 81.

93.     Defendant RHY issued a registration statement on January 9, 2006 and amendments thereto on January 18, 2006 and November 14, 2006.

94.     That registration statement and its amendments contained materially false and misleading statements and omissions as alleged in this Complaint.

95.     Defendant PwC opined on the accuracy and GAAP compliance of the financial statements contained in RHY's registration statement and amendments.

96.     The individual defendants signed the registration statements and amendments.

97.     Plaintiffs and the putative class purchased RHY shares traceable to the registration statement.

### COUNT TWO—VIOLATION OF § 15 of THE SECURITIES ACT OF 1933

**Against Defendants Regions, Kelsoe, and Morgan Asset Management**

98.     Plaintiffs reincorporate here by reference the allegations contained in paragraphs 1 through 81.

99.     As alleged in paragraphs 94 through 96, Defendant RHY violated Section 11(a) of the Securities Act of 1933.

100.    At all relevant times hereto, Defendant Regions served as the parent to Defendant RHY and exercised daily operative control of RHY's activities, including RHY's preparation and dissemination of the misleading registration statement and amendments.

101.    Defendant Regions possessed, but did not exercise, the authority to prevent RHY's violations of Section 11(a) of The Securities Act of 1933.

102.    At all relevant times, Defendant Kelsoe served as RHY's portfolio manager. As such, Defendant Kelsoe possessed the power to control the content of RHY's registration statement and amendments.

103.    At all relevant times, Defendant Morgan Asset Management served as RHY's advisor and, as such, participated in the daily operations, policies, and management of RHY.  As such, like Defendant Kelso, Defendant Morgan Asset Management possessed the power to control the content of RHY's registration statement and amendments.

### COUNT THREE—VIOLATION of SECTION 10(b) of THE SECURITIES EXCHANGE ACT of 1934

**Against Defendants Morgan Keegan, RHY, RMA, RSF, RMH, Kelsoe, and PwC.**

104.    Plaintiffs incorporate here by reference the allegations contained in paragraphs 1 through 81.

105.    The Defendants made the materially false and misleading misstatements and omissions identified in this Complaint.

106.    The Defendants did so with the requisite level of scienter.

107.    The Funds' shares traded in an efficient market, being listed and sold on a national exchange.

108.    The Defendants' misstatements and omission caused the Plaintiffs' financial loss.

### COUNT FOUR—VIOLATION of SECTION 20(a) of THE SECURITIES EXCHANGE ACT of 1934

**Against Defendants Regions, Morgan Asset Management, Anthony, Weller, Maxwell, and Morgan**

109.    Plaintiffs here incorporate by reference the allegations contained in paragraphs 1 through 81.

110.    Defendants RHY, RMA, RSF, RMH violated Section 10(b) of The Securities Exchange Act of 1934, as alleged in paragraphs 106 through 110.

111.    At all times relevant, Defendant Regions served as the parent to the Funds and exercised operational control over the Funds' public statements and S.E.C. filings, as well as the Funds' management and policies.  Consequently, Defendant Regions possessed the power to control and prevent the misstatements and omissions by the Funds.

112.    At all times relevant, Defendant Morgan Asset Management served as advisor to each of the Funds and participated in the daily operations, management, and policies of the Funds, including controlling the Funds' valuation of assets and public statements and filings regarding same.

28

113.    At all times relevant, Defendant Anthony served as RHY's and RMA's President and Chairman.  In his role as RHY's and RMA's President and Chairman, Anthony participated in and exercised control over RHY's and RMA's daily operations, management, and policies.  Further, Anthony possessed the power to control (and to prevent) the material misstatements and omission made in RHY's and RMA's public statements and S.E.C. filings.

114.    At all times relevant, Defendant Weller served as Treasure for all four Funds. In his role as the Funds' Treasurer, Weller participated in the Funds' daily accounting and valuation activities and statements, management, and policies.  As Treasurer, Weller possessed the power to control (and to prevent) the misstatements and omissions regarding the Funds' asset valuations.

115.    At all times relevant, Defendant Maxwell served as RSF's and RMH's President and Chairman.  In his role as RSF's and RMH's President and Chairman, Anthony participated in and exercised control over RSF's and RMH's daily operations, management, and policies.  Further, Anthony possessed the power to control (and to prevent) the material misstatements and omission made in RSF's and RMH's public statements and S.E.C. filings.

116.    At all times relevant, Defendant Morgan served as Morgan Keegan's Chairman and Executive Managing Director.  In this role, Morgan participated in and exercised control over Morgan Keegan's daily operations, management, and policies. Further, Morgan possessed the power to control (and to prevent) the material misstatements and omission made by Morgan Keegan.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

A.      Certifying this putative class action as a class action under Rule 23 of the Federal Rules of Civil Procedure;

B.      Finding that, as alleged in this Complaint, the Defendants violated Sections 11(a) and 15 of The Securities Act of 1933;

C.      Finding that, as alleged in this Complaint, the Defendants violated Section 10(b), Rule 10b-5, and Section 20(a) of The Securities Exchange Act of 1934;

D.      Awarding Plaintiffs and the putative Class statutory damages;

E.      Award Plaintiffs reasonable costs and attorneys' fees; and

F.      Awarding such equitable or injunctive relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs demand a jury trial on all issues so triable.

Dated: April 8, 2010.

/s/ Frank L. Watson, III
Frank L. Watson, III
WATSON BURNS, PLLC
11 South Idlewild Street
Memphis, Tennessee 38104
Telephone: (901) 529-7996
Fax: (901) 529-7998
Tenn. Bar No. 15073

Marc J. Bern*
N.Y. Bar No. 1859271
Adam Gana*
N.Y. Bar No. 4408431
NAPOLI BERN RIPKA, L.L.P.
350 Fifth Avenue, Suite 7413
New York City, NY  10118
(212) 267-3700

Jeffrey R. Sonn*
Fla. Bar No.  773514
Scott L. Adkins*
Delaware Bar No. 3923
SONN & EREZ, P.L.C.
500 East Broward Blvd., Suite 1600
Fort Lauderdale, FL 33394
(954) 763-4700
(954) 763-1866 (facsimile)

*pro hac vice pending


Counsel for Plaintiffs and the absent
Members of the putative Class